AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>Juan Posada, | )<br>)<br>)<br>)<br>)<br>) |

FILED

SEP - 4 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

Case No.   3 19 71449

~~UNDER SEAL~~

_____
        *Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____December 17, 2017_____ in the county of _____San Francisco_____ in the

_____Northern_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form:

_____
WILLIAM FRENTZEN
Assistant United States Attorney

_____
*Complainant's signature*

Janette Spring, Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___9/3/19___

_____
*Judge's signature*

City and state:        San Francisco, California

Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

## I.   INTRODUCTION

### A.   SYNOPSIS

1.      I submit this affidavit in support of a criminal Complaint for Dr. Juan POSADA ("POSADA").

2.      There is probable cause to believe POSADA engaged in a scheme to defraud Medicare by receiving cash kickback payments in exchange for the referral of home health and/or hospice patients in violation of 42 U.S.C. §1320a-7b(b), the anti-kickback statute.

3.      As part of this investigation, the Agents have obtained information from the cooperation of an FBI confidential witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE"):

4.      CW-1 introduced POSADA to UCE as an individual who was willing to accept kickback payments in exchange for the referral of patients.

5.      During the course of the investigation, CW-1 held several in-person audio and video recorded conversations with POSADA, in 2017 and 2018, in which POSADA received a kickback payment in the form of cash in exchange for the referral of patients for home health or hospice services.

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

**B.  BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION**

6.      Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care.[2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services. The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

7.      An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments

8.     Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

9.     In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

10.     In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon

3

analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care. [5]  During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE

---

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C.  AGENT QUALIFICATIONS

11. I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

12. In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b and 18 U.S.C. Section 371.

13. This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### D.  COMPLAINANT

14. Dr. Juan POSADA, is a 58-year-old licensed physician who resides in San Jose, CA and is the owner and director of a private family practice. During the course of the investigation, POSADA accepted $1,200 from CW-1 and UCE in exchange for agreeing to send patient referrals to HHA Alpha.

### E.  STATUTE VIOLATED

15.  **Title 42, United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II. PROBABLE CAUSE

### A.  POSADA ACCEPTS KICKBACK PAYMENTS IN EXCHANGE FOR THE REFERRAL OF MEDICARE PATIENTS.

16.  On February 1, 2017, CW-1 recorded a meeting with POSADA at POSADA's office in San Jose, CA. The purpose of the meeting was to discuss a kickback arrangement in which CW-1 would pay POSADA for patient referrals to HHA Alpha. During the meeting, POSADA asked how CW-1 would reimburse him for ten patient referrals. POSADA used a similar offer of $5,000 from Amity Home Health Care, Inc. ("AMITY") as an example of how much could be expected in exchange for the patient referrals. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| POSADA: | So if I have five patients a month or 10 patients a month, is that good for you? | |
| CW-1: | If it is doable I can, if not we can work it out. I know Amity is in the business. We just need a number to start with. How do we get into a system where we can work together? | CW-1 is intimating it is known AMITY pays kickbacks and CW-1 is asking POSADA what kickback amount is expected in return for the 10 patients. |
| POSADA: | How will you reimburse me? Say, I send 10 patients? | |
| CW-1: | We don't deal that way, but we do have like medical directors and stuff like that so we…if they are referred to us and we have different terms with them but I know this market is totally different here. So, whatever Amity is doing, let's see if we can compete with that. | CW-1 is explaining that despite the fact that HHA Alpha does not normally pay kickbacks, CW-1 was willing to enter into a kickback relationship with POSADA in order to be competitive. |

| ... | | |
|---|---|---|
| POSADA: | It's okay, you can be open, you know. Just tell me how you do with the other business, other physicians. | POSADA is encouraging CW-1 to speak openly about the scheme. |
| CW-1: | I know how Amity does. Amity does…pay either cash or…or they pay check, or give gifts. | |
| POSADA: | So you guys don't do that right? Or you do that? | POSADA is trying to gauge whether or not CW-1 is willing to pay him a kickback |
| ... | | |
| POSADA: | Say with Amity, they offer me, let's say like five thousand dollars if I send 10 patients on a regular basis, five thousand dollars. | |
| CW-1: | Per month? | |
| POSADA: | Yeah. | |
| CW-1: | But there's no, is it like they give you a number of 5 patients or 10 patients? | |
| POSADA: | No, they just say whatever you have. | |
| CW-1: | And they're just paying you cash? | |
| POSADA: | Yeah. | |

17. During the same meeting, POSADA explained he was hesitant to engage in the kickback scheme, acknowledging it was illegal. Despite this, POSADA seemed open to an arrangement with CW-1, suggesting CW-1 to think of a strategy to move forward with their arrangement. When CW-1 offered POSADA a similar kickback arrangement as AMITY, POSADA explained he stopped working with AMITY because he did not have many patients in need of home health services. POSADA however offered to sign paperwork authorizing services for other patients referred to HHA Alpha. POSADA was likely offering to sign paperwork authorizing home health services for patients that were not under his care. This would allow for HHA Alpha to bill for services without the scrutiny of the patient's actual doctor. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| POSADA: | But I know it's illegal to get money back right? So that's illegal right? So I-I don't know, think about a stra- a strategy and let me know. | |

| | | |
|---|---|---|
| CW-1: | If Amity offered you five, you said no, do we have to go, if we came back with the same deal would you say no or do we have to go higher? Because if I go back and then come back again, I don't want to do the back and forth thing, you know what I mean? That I would – I don't want you to tell me yes and you say five now it's going to be more than that. | CW-1 offers POSADA the same arrangement as AMITY, $5,000 per month. |
| POSADA: | Um, the reality is I don't do anything because I don't have a lot of patients, uh, requiring in home health, um so I don't want to do it again,um… | POSADA denies accepting kickbacks from other companies because he did not have patients to provide for services. |
| CW-1: | No worries, just-just think about it. | |
| POSADA: | I'll sign for you for free. | |
| CW-1: | Oh of course-of course. | |
| POSADA: | Send me patients and I'll sign the paperwork. | |

18. After their meeting, POSADA contacted CW-1 on his cellular telephone and provided the name and telephone number of a Medicare patient he was referring to HHA Alpha. During their conversation, POSADA indicated he would refer additional patients to HHA Alpha. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| POSADA: | I have a patient for you, for hospice | |
| CW-1: | Beautiful we can take that, yes | |
| POSADA: | Let me give you a name | "Patient 1"[6] |
| … | | |
| POSADA: | And I will start sending you patients from today okay? | |
| CW-1: | You got it | |

19. On February 10, 2017, CW-1 recorded a conversation with SANTOS, during which SANTOS describes her failed attempt to pay POSADA a $5,000 cash kickback for patient referrals. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| CW-1: | Posada is all about… | |
| SANTOS: | Per patient, what will you give me? I even offered it. | |

---

[6] Throughout this affidavit, I have removed patients' names to protect their privacy, and have referred to them instead as "Patient 1," "Patient 2," etc

| | | |
|---|---|---|
| CW-1: | Oh, he took it c'mon. | |
| SANTOS: | No! | |
| CW-1: | He did! I know…I work with him for 3 years I know exactly. | |
| SANTOS: | He did not, I was there I swear to God. We have an envelope me and Brenda… | |
| CW-1: | He's not exactly lying to me. | |
| SANTOS: | No we brought and envelope and showed him [unintelligible] and he wouldn't take it I swear. | |
| CW-1: | How much did you pay him? | |
| SANTOS: | Five thousand. | |
| CW-1: | Cash? | |
| SANTOS: | Yes! He refused to take it. And recently I sent him 3 patients. | |

20. On August 31, 2017, CW-1 introduced UCE to POSADA during a recorded meeting at

POSADA's office in San Jose, CA. During their meeting, UCE explained his/her involvement in the

takeover of HHA Alpha. UCE expressed a preference for patient referrals with Medicare benefits as

Medicare offered higher reimbursement rates for services. UCE offered to pay POSADA $1,000 cash for

the first month he could provide patients referrals and then increase the payment to $2,000 the following

month. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | So, what we would like to do is, if you're ok with it, I don't know what, but what we would like to do is a thousand for the first month, two thousand for the second month. | |
| CW-1: | We don't expect much, maybe two patients, then three, then four. | |
| POSADA: | Home health? | |
| CW-1: | Yes and hospice, either way. | |
| UCE: | I mean, of course Medicare pays the best, but if you're ok, I can start with a thousand now. If that's not competitive with what you're getting from others, let us know. We want to be competitive. | |
| POSADA: | Uh huh. Let's uh come back next week. We can talk next week. Is that ok? | |
| CW-1: | That's fine. | |
| POSADA: | Ah, let's see, you can come for lunch, we can arrange a lunch meeting. | |

On September 5, 2017, CW-1 and UCE returned to POSADA's office per POSADA's request. During their meeting, CW-1 and UCE explained their involvement in the takeover of HHA Alpha and in doing so, were willing to pay POSADA kickbacks in exchange for patient referrals. During their exchange, POSADA offered the example of $600 as an amount per patient paid by other home health and hospice companies. Below is an excerpt of the aforementioned exchange:

| Speake | Statement | Additional Explanation |
|---|---|---|
| CW-1: | ...It's very open, you tell me, how you can work it out, we do it that way. We can work it out. I know Amity does it different ways, I know other companies do it different ways. Ah, we don't want to low ball or that kinda stuff too. What numbers are you feeling comfortable with? | |
| POSADA: | What they are paying now are...some companies is six hundred per patient. | $600 per patient. |
| CW-1: | Ok. | |
| UCE: | Well, where we would like to start is, so if you're comfortable with it, we think starting up slowly so it doesn't look like too many at one time. But if you, if you feel that it's not competitive for you, we can certainly do something upfront, ah something bigger upfront. | |
| POSADA: | No, it's ok. So, I can give you a patient and then, or you can, you know, we can meet. This concerns me. If you know...it's very... | |
| CW-1: | The only thing is, this is what he is try to say, we. It's going to take about eight months for the paperwork, the company, so we want the traditional growth, real slow. We don't want like hey, tomorrow we have twenty patients all of a sudden. That's like.... | |
| POSADA: | Ok, so you want me to send you a few patients in the beginning? | |
| CW-1: | First month we do two, second month we do four, maybe we keep increasing that way. Show us a steady growth. In the meantime, if you want to share your patients with everybody else, please do. | |
| POSADA: | Ok, ok. | |
| CW-1: | Because when we take over we don't want to show our numbers to be higher than the other guys. | |
| UCE: | We just think it looks better because we think some of our competitors are a little too aggressive. And I think it looks odd if all of a sudden ten patients go | UCE stresses the importance of being careful and building the relationship slowly by not referring too many patients too |

| Speaker | Statement | Additional Explanation |
|---|---|---|
| | out the door to one place. We're just trying to be careful for all of us. But, but again… | quickly as that could draw scrutiny from law enforcement. |
| POSADA: | But is it ok if you ah, ah… | POSADA was confirming the negotiated price of $600 per patients was acceptable. |
| UCE: | The 600? | |
| CW-1: | Yeah, absolutely. | |
| UCE: | So, what I would like to do as basic trust, for two for this month I can give you twelve hundred right now. And if we… | |
| POSADA: | Would I have to send you anybody? | |
| CW-1: | You have sent me hospice patient, we can, if you want you can take… | |
| UCE: | We also do hospice as well. | |
| CW-1: | Yeah. Or kinda let me know if that's the difference… | |
| POSADA: | I will tell you the patients and then we talk after that. Is that ok? | |

21. On December 14, 2017, CW-1 and UCE recorded a meeting with POSADA at his medical office in San Jose, CA. During their meeting, UCE confirmed POSADA was satisfied with receiving a kickback payment of $600 per patient. POSADA asked if he had sent any patients to HHA Alpha and CW-1 reminded him of the referral of Patient 1. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | So that's the other thing. The last time we were here there might've been a misunderstanding. We'd like to put down something just to show good faith to start. | UCE is explaining they were willing to pay POSADA up front for patient referrals. |
| POSADA: | Mmhmm. Mmhmm. | |
| UCE: | I think we talked about $600. Is that what you were happy with? | |
| POSADA: | Per patient? | |
| UCE: | Yeah. | |
| POSADA: | Well, I don't know. Do I give you any patients already? | |
| CW-1: | The one I had had from you, was hospice, way back. | CW-1 is referring to the referral of Patient 1 in February. |
| POSADA: | Okay. | |
| CW-1: | After, we talked about it, nothing after that. So what we decided was, hey, let's do a good faith. So at least we are, you know, working relationship. Once you have one, keep us in mind, do it… | |

| POSADA: | No problems with the government, with nothing like that right? | |
|---|---|---|
| CW-1: | I don't want to have any problems. | |
| UCE: | Neither do we. Let me just put it that way. If there's anything you are uncomfortable with or anything you think we should change, please let us know. We, our goal is to be as careful as possible. | |
| POSADA: | Let me tell Patricia that we should send patients to you. | |

22. At the conclusion of their meeting, UCE paid POSADA $600 a "good faith" payment to

begin their kickback arrangement. After receiving the kickback payment, POSADA reassured he would

send patient referrals to HHA Alpha. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | This is just a good faith $600. | UCE paid POSADA a good faith payment as a way to establish their of trust that POSADA would later send patient referrals and UCE pay up front in order to establish their relationship. |
| POSADA: | That's fine. | |
| UCE: | Thank you, sir. | |
| POSADA: | So, yeah, I'll send you a patient in, uh, see if we try a respiratory, um... | |
| CW-1 | Okay. | |
| UCE: | Excellent. | |
| POSADA: | Thank you. | |

23. On January 25, 2018, CW-1 and UCE recorded a meeting with POSADA at his office in

San Jose, CA. During the meeting, UCE explained s/he was unaware of the referral of Patient 1 in

February. UCE indicated had s/he known, UCE would have paid POSADA for the referral during their

previous meeting. Below is an excerpt of the aforementioned exchange:

| Speake | Statement | Additional  Explanation |
|---|---|---|
| UCE: | Came to check if everything is okay and I, uh, I guess, I didn't realize that before I met you that you'd already given us some work. | UCE is referring to the referral of Patient 1 in February and UCE's failure to acknowledge the referral during their previous meeting. |
| CW-1: | He gave us a hospice patient, so we said hey... | |
| POSADA: | Maybe, yeah, maybe I give you a few, yeah. | |
| CW-1: | He gave us a hospice patients, yes. | |
| UCE: | Yeah. So, I, I just wanted to, I, I, I, thought I was giving you for the next one, but I realized we, we | UCE is explaining s/he would have paid POSADA for the referral of Patient 1 ["take care of that"] during their prior meeting had s/he |

| | | |
|---|---|---|
| | didn't even take care of that, so I have, for the next one here for you, if that's okay? | known about the referral ahead of time. |
| POSADA: | I'm not sure about that, even if I deserve it right? What do you mean? How much is that? | POSADA was unsure if he should specify how much he should be paid for the referral of Patient 1. |
| UCE: | $600 for the next patient. | |
| CW-1: | So whether you have one… | |
| POSADA: | For, uh, hospice? | |

24. Later in the same meeting, POSADA offered to send hospice patient referrals to HHA

Alpha. UCE asked POSADA if he wanted a different kickback amount for the hospice referrals.

POSADA indicated he was unsure what payment amount he should ask for and asked UCE what other

physicians were receiving. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | Okay. Well, uh, we're, we're comfortable with that. Are you comfortable with the same rate for hospice? | |
| POSADA: | I don't know. What is it out there? What is, what is, uh- | |
| UCE: | So, um, I mean, I think, we, we've generally been doing a rate of, um, for most physicians, two is about a thousand, uh, if they're working and giving us eight in a month, we give them three thousand. That's normally what we've been doing, but depending on, you know, we wanna match what, you know, what, we don't believe that every person gets the same. So, because if you've got other relationships, we want to be competitive. So, we, you know, if you have, if that's not competitive, we will become competitive. | |
| CW-1: | We're talking about the home health aspect now, so if you have something different hospice- | |
| POSADA: | So you go to which doctors around here? Who are you going- | |

25. At the end of the meeting, POSADA agreed to send hospice patient referrals to HHA

Alpha. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| POSADA: | So, because I don't wanna, let's see I'll get some, if I have hospice, I'll send you a patient. | |
| UCE: | Perfect. | |
| CW-1: | Okay. | |
| POSADA: | Thank you very much. | |

## B.  A CO-CONSPIRATOR PROVIDES INFORMATION THAT POSADA RECEIVED KICKBACKS FROM OTHER ENTITIES

26. On March 19, 2019, the FBI interviewed a skilled nursing marketer, Rebecca PINA ("PINA"). Agents learned that in 2005 or 2006, PINA worked as the director of marketing for White Blossom Care Center ("White Blossom") in San Jose, CA. White Blossom was a Medicare-certified short term rehabilitation and skilled nursing home.

27. As part of her duties, PINA created invoices for the facility's medical directors. PINA reviewed each invoice with each medical director to ensure the invoice's accuracy. Instead of documenting legitimate services provided to White Blossom, in actuality, the invoices documented the number of patients each medical director had referred to the facility. For example, one hour was the equivalent of one patient referral. Therefore, the payment amount on the invoice reflected the amount of money each medical director was receiving in kickbacks for their patient referrals sent to White Blossom.

28. PINA met with POSADA each month to verify how many patients he referred to White Blossom. On their face, the invoices listed the amount of hours POSADA supposedly spent providing legitimate services to White Blossom. However, the sole purpose of the invoices were to track the number of referrals sent by POSADA, and other physicians, and the amount of the kickback payment POSADA received in exchange for those referrals.

## III.    PROBABLE CAUSE FOR THE VIOLATION

### A.  TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(1)(A), THE ANTI-KICK BACK STATUTE

29. Title 42 United States Code, Section 1320a-7b(b)(1)(A), in relevant part, makes it a crime to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any service for which payment may be made in whole or in part under a Federal health care program.

30. Based on all of the foregoing, probable cause exists to believe that POSADA accepted kickback payments from UCE that were intended to induce POSADA to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

31. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by POSADA for home health or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

32. Therefore, there is probable cause to believe POSADA's agreement to send patient referrals to HHA Alpha in exchange for cash payments from UCE meets the definition of a kickback payment and violates anti-kickback statute.

## IV.    CONCLUSION

33. Based on the foregoing, there is probable cause to believe POSADA engaged in a scheme to receive kickbacks in exchange for patient referrals, in violation of Title 42 U.S.C. § 1320a-7b(b)(1)(A).

## V.    REQUEST FOR SEALING

34. Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect.

//

//

//

//

//

//

//

//

//

//

//

Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me

this _____ day of September, 2019.

HON. JOSEPH C. SPERO
United States Chief Magistrate Judge